UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #:_____
DATE FILED:___9/13/2021___
└─────────────────────────────────────┘
```

Patricia Young,

                              Plaintiff,

                -against-

Kilolo Kijakazi,[1]

                              Defendant.

20-cv-03604 (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Patricia Young ("Young" or "Plaintiff") brings this action pursuant to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Not. of Mot., ECF No. 14; Comm'r Not. of Mot., ECF No. 21.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is DENIED, and the Commissioner's cross-motion is GRANTED.

<u>BACKGROUND</u>

I.    <u>Procedural Background</u>

On May 23, 2017, Young filed applications for DIB and SSI, with an alleged disability onset date of November 30, 2016. (Administrative R., ECF No. 10 ("R."), 17.) The Social Security

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security, succeeding Commissioner Andrew Saul. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Kilolo Kijakazi in the caption in place of Andrew Saul. No further action need be taken to continue this suit. *See* 42 U.S.C. § 405(g).

Administration ("SSA") denied her application on July 14, 2017, and Young filed a written request for a hearing before an Administrative Law Judge ("ALJ") on July 25, 2017. (*Id.*) A video hearing was held on December 3, 2018 before ALJ Theodore W. Grippo. (*Id.*) Young was represented at the hearing by attorney Ari Peterson. (*Id.*) In a decision dated January 30, 2019, ALJ Grippo found Young not disabled. (R. 29.) Young requested review of the ALJ decision from the Appeals Council. Her request was denied on March 18, 2020, making ALJ Grippo's decision the Commissioner's final decision. (R. 1-6.) This action followed.

II.     **Non-Medical Evidence**

Born on April 8, 1966, Young was fifty years old on the alleged onset date. (*See* R. 455, 572.) Young has an eleventh-grade education. (R. 441, 587.)

From approximately December 2008 through December 2013, Young worked as a cleaner for a janitorial service. (R. 587.) From approximately May through November 2016, she had a similar custodial position with the Mark Morris Dance Center. (R. 587.)

III.    **Medical Evidence Before the ALJ**[2]

A.     **Dr. Daniel Cohen, PhD—Psychiatric Consultative Examiner**

On June 26, 2017, psychologist Daniel Cohen performed a psychiatric consultative examination of Plaintiff. (R. 679-83.) His evaluation reflects that Plaintiff arrived by taxi and that she stated that she could not work "due to physical reasons." (R. 679.) Under "Psychiatric History,"

---

[2] Plaintiff does not challenge, and the parties did not brief, the ALJ's findings concerning Plaintiff's physical impairments, or his finding that she is not physically disabled. (*See* Pl.'s Mem. at 2 & n.2 ("Plaintiff concedes, for the sake of argument, that the ALJ's *physical* finding is free of error[.]" (emphasis in original)); Comm'r Mem., ECF No. 22, at 2 n.2.) Accordingly, the Court summarizes and analyzes only evidence related to Plaintiff's claimed mental impairments. *See, e.g.*, *Brogdon v. Berryhill*, No. 17-CV-07078 (BCM), 2019 WL 1510459, at *2 (S.D.N.Y. Mar. 22, 2019) (collecting cases).

Dr. Cohen noted that Plaintiff had "never received inpatient or outpatient mental health services." (R. 679.)

Plaintiff reported to Dr. Cohen that she had difficulty sleeping (R. 679); that she experienced depressive symptomatology (including "dysphoric moods, crying spells, . . . concentration difficulties, low motivation, . . . social withdrawal, and sometimes hopelessness") approximately five days per week, anxiety-related symptomatology (including "irritability, nightmares . . . , hypervigilance, and flashbacks") daily, and panic attacks two to three times per month (R. 679-80); and that her anxiety increased significantly in crowded places. (R. 680.) Plaintiff denied suicidal or homicidal ideation, manic symptomology or thought disorder. (R. 679-80.) She reported that she used alcohol infrequently, but that, since the age of eighteen, she had used cannabis on a daily basis to help her sleep. (R. 680.)

On examination, Dr. Cohen found that Plaintiff was "cooperative and achieved an adequate manner of relating" with her examiner; had a "fairly groomed" appearance; exhibited normal posture, motor behavior and eye contact; spoke in a fluent and clear voice, with adequate expressive and receptive language; and demonstrated a "coherent and goal directed" thought process. (R. 680-81.) He described her affect as "[a]nxious" and her mood as "excited." (R. 680-81.) He found her sensorium clear; that she was oriented to person, place and time; and that her attention and concentration were "intact." (R. 681.) He found her memory to be "impaired," her intellectual functioning "below average," and her general fund of information "somewhat limited." (R. 681.) He assessed her insight and judgment to be "[f]air." (R. 681.)

Under "Mode of Living," Dr. Cohen reported that Plaintiff was "able to dress/bathe/groom herself, cook and prepare food, do general cleaning, take public

transportation, and do laundry." (R. 681.) He noted that she relied on others for assistance with

shopping—because "she forgets what she is supposed to buy by herself"—and managing money.

(R. 681.)

Dr. Cohen found that Plaintiff showed no evidence of limitation in (1) understanding,

remembering or applying simple directions and instructions; (2) maintaining personal hygiene

and appropriate attire; and (3) having awareness of normal hazards and taking appropriate

precautions. (R. 682.) He found that she showed mild limitations in (1) using reason and judgment

to make work-related decisions; (2) interacting adequately with supervisors, co-workers and the

public; (3) sustaining concentration and performing a task at a consistent pace; and (4) sustaining

an ordinary routine and regular attendance at work. (R. 682.) He found that she showed

moderate limitations in understanding, remembering or applying complex directions and

instructions, and marked limitations in regulating her emotions, controlling her behavior and

maintaining her well-being. (R. 682.) He noted that "the results of the examination appear to be

consistent with psychiatric, substance abuse, and cognitive problems and may significantly

interfere with the claimant's ability to function on a daily basis." (R. 682.)

Dr. Cohen diagnosed Plaintiff with (1) major depressive disorder, recurrent, moderate; (2)

panic disorder; (3) agoraphobia; (4) PTSD; and (5) cannabis abuse. (R. 682.) He recommended

individual psychological therapy, psychiatric intervention and substance abuse counseling. (R.

682.) Citing her "psychiatric problems and substance abuse," he found that her prognosis was

"fair" and that she would need assistance managing her funds. (R. 682-83.)

**B.     Dr. S. Junga, PhD—State Agency Psychological Consultant**

On July 17, 2017, a Disability Determination Explanation ("DDE") prepared in connection with Plaintiff's disability insurance claim was co-signed by a State Agency psychological consultant whose name appears as "S. Junga, PhD." (R. 455-67.) Dr. Junga signed those portions of the DDE corresponding to Plaintiff's mental impairments and mental Residual Functional Capacity ("RFC"), as well as the portion corresponding to the DDE's overall conclusions. (*See* R. 459, 465, 466.)

In the "Psychiatric Review Technique (PRT)" section of the DDE, Dr. Junga indicated that "a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria" of "Depressive, Bipolar, and Related Disorders" and "Anxiety and Obsessive-Compulsive Disorders." (R. 458-59.) In this section of the DDE, Dr. Junga indicates that Plaintiff was not limited in her ability to interact with others, but was mildly limited in her abilities to "[u]nderstand, remember, or apply information" and to "[a]dapt or manage oneself" and moderately limited in her ability to "[c]oncentrate, persist, or maintain pace." (R. 459.)

In the "Mental Residual Functional Capacity Assessment" section of the DDE, Dr. Junga indicated that Plaintiff was not significantly limited in her abilities to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or in proximity to others without being distracted by them; (7) make simple work-related decisions; (8) be aware of normal hazards and take appropriate precautions; and (9) set realistic goals or make plans independently of others.

(R. 463-64.) Dr. Junga further indicated that Plaintiff was moderately limited in her abilities to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (5) respond appropriately to changes in the work setting; and (6) travel to unfamiliar places or use public transportation. (R. 463-64.)

Ultimately, the DDE concluded that Plaintiff was limited to light, unskilled work, but that she was "[n]ot [d]isabled." (R. 466.)

### C.      Dr. Bruce H. Soloway, M.D.—Treating Physician

The record indicates that Dr. Bruce H. Soloway, M.D. began treating Plaintiff in approximately 2014. (*See* R. 693.) However, the earliest treatment notes from Dr. Soloway in the record date to June 9, 2017. (R. 737-54.) At that visit, Dr. Soloway diagnosed Plaintiff with physical impairments only: "[c]hronic bilateral low back pain without sciatica," "[m]enopause," and "[c]arpal tunnel syndrome on right." (R. 737.) Dr. Soloway's June 9, 2017 treatment notes indicate that Plaintiff was "[u]nemployed, [but] would like to work." (R. 739.)

Beginning with Plaintiff's next visit, on June 30, 2017, Dr. Soloway administered the GAD-2 and PHQ-2 tests, two preliminary screening tools used to assist in diagnosing anxiety and depression, respectively. (*See* R. 758; *see also* R. 771.) On January 25, 2018, Dr. Soloway first diagnosed Plaintiff with generalized anxiety disorder after administering another anxiety screening tool, a GAD-7 questionnaire, on which Plaintiff scored a 14, indicating moderate

anxiety.[3] (*See* R. 780, 784, 787.) Dr. Soloway's treatment notes from that day state that Plaintiff's anxiety "[m]ay be contributing to widespread [physical] complaints without objective correlation." (R. 784; *see also id*. (indicating that Plaintiff's back pain and "chest pain on exertion" may be "exacerbated by anxiety").)

During Plaintiff's subsequent visits, Dr. Soloway noted Plaintiff's symptoms of anxiety and depression, including her varying scores on the GAD-7, which ranged from 6, indicating mild anxiety, to 21, indicating severe anxiety. (*See, e.g.*, R. 805 (March 22, 2018, score of 21); R. 828 (April 26, 2018, score of 6); R. 864 (June 20, 2018; score of 12).) On March 22, 2018, Dr. Soloway started Plaintiff on a prescription for Fluoxetine (Prozac); he subsequently increased the dosage twice, in April and September of that year. (R. 811, 829, 886.)

On October 18, 2018, Dr. Soloway completed a "Treating Source Statement" on Plaintiff's "Physical Conditions." (R. 693-96.) Dr. Soloway listed Plaintiff's diagnoses as "[g]eneralized anxiety disorder, chronic pain syndrome, somatization disorder, low back pain, neck pain, [and] right shoulder pain." (R. 693.) When prompted to indicate how often Plaintiff was "likely to be 'off task'"—*i.e.*, "how much of a typical workday would [Plaintiff's] symptoms be severe enough to interfere with the attention and concentration needed to perform even simple work-related tasks"—Dr. Soloway indicated that she would be off task more than 25% of the time. (R. 693.) He further estimated that Plaintiff would be able to maintain attention and concentration for less than 30 minutes (but greater than 15 minutes) at a time "before requiring a break due to

---

[3] A GAD-7 score of 5-9 indicates mild anxiety; 10-14 indicates moderate anxiety; and 15+ indicates severe anxiety. *See* https://www.dartmouth-hitchcock.org/sites/default/files/2021-02/gad-7-anxiety-scale.pdf.

symptoms such as pain or medication side effects," and would likely be absent 4 days per month "as a result [of her] impairments and/or treatment." (R. 693.)

On October 25, 2018, Dr. Soloway changed Plaintiff's medication from Fluoxetine (Prozac) to Escitalopram (Lexapro). (R. 915.) On November 29, 2018, at Plaintiff's last appointment in the record, Dr. Soloway noted that Plaintiff "reported [that her] anxiety [had] improved on [the] new medication." (R. 932.)

### D.   Lauren Fuchs, Licensed Master Social Worker ("LMSW")—Treating Therapist

On October 22, 2018, LMSW Lauren Fuchs completed a "Treating Source Statement" on Plaintiff's "Psychological Conditions" that was co-signed by Dr. Soloway. (R. 697-702.) Ms. Fuchs indicated on that form that she had begun treating Plaintiff on March 29, 2018. (R. 697.) She listed Plaintiff's diagnosis as "Anxiety Disorder with Somatization," with a prognosis of "Poor." (R. 697.) When prompted for "the particular medical or clinical findings which support your diagnoses and [] assessment of [Plaintiff's] limitations," Ms. Fuchs indicated that Plaintiff "ha[d] been experiencing chronic pain, insomnia, and shortness of breath due to anxiety," and that, as of October 18, 2018, Plaintiff was also experiencing "lack of control over worry, and lack of energy." (R. 697.) Ms. Fuchs indicated that Plaintiff experienced chronic pain, insomnia, and lack of energy daily. (R. 698.) Ms. Fuchs reported that Plaintiff had stated in March 2018 that her symptoms had been present for "at least a year." (R. 697.)

Ms. Fuchs indicated that Plaintiff's symptoms were associated with "[d]isturbance of mood accompanied by full or partial depressive syndrome," but not with bipolar syndrome, obsessive compulsive disorders, or "anxiety limited to the presence of a particular object or situation." (R. 697.) In a chart of potential symptoms, Ms. Fuchs checked boxes corresponding to

"Sleep disturbance," "Decreased energy," and "Motor tension," but none of the boxes listed under "Manic Syndrome," "Schizophrenia" or "Loss of Cognitive Abilities." (R. 698.)

Ms. Fuchs found that Plaintiff was "[n]ot [l]imited" in her abilities to (1) understand, remember or apply information; (2) interact with others; and (3) remember locations and work-like procedures; and also in her (4) long term memory. (R. 700-01.) Ms. Fuchs found Plaintiff "[m]ildly [l]imited" in her abilities to (1) adapt or manage herself; (2) understand and carry out "very short and simple instructions"; and (3) understand and carry out "detailed but uninvolved written or oral instructions"; and also in her (4) short term memory. (R. 700-01.) Ms. Fuchs found Plaintiff "[m]arkedly [l]imited" in her "ability to concentrate, persist, or maintain pace," providing as "example[s] of [Plaintiff's] limitations" her "lack of energy, chronic pain during activity or when completing tasks, [and] daily shortness of breath from anxiety." (R. 700.)

Ms. Fuchs indicated that Plaintiff would be able to "maintain regular attendance and be punctual within customary tolerances," and that she was "able to work appropriately with" the general public, co-workers and supervisors. (R. 701-02.) She indicated that Plaintiff would not require "enhanced supervision" or "praise and positive reinforcement from supervisors to handle stress and emotions." (R. 701-02.) When prompted for "the degree and extent of [Plaintiff's] capacity or limitation in social interaction," she indicated that Plaintiff "has the capacity to be socially interactive." (R. 702.) She indicated that Plaintiff had the abilities to "maintain socially appropriate behavior" and "respond appropriately to changes in work settings." (R. 702.)

Ms. Fuchs indicated that Plaintiff would be "able to maintain attention and concentration before needing redirection or requiring a break" for a period of less than an hour, but greater than a half hour. (R. 701.) She indicated that Plaintiff had the capacity to be socially interactive

and adapt to changing work settings, but that Plaintiff was "likely to be 'off task'" twenty percent of the time and "likely to be absent from work" for "4+" days per month "as a result [of her] impairments and/or treatments." (R. 702.)

Although ALJ Grippo agreed to hold the record open for two weeks after the December 2018 hearing so that Plaintiff might obtain and submit treatment notes from Dr. Soloway and Ms. Fuchs, no notes from Ms. Fuchs are in the record. (*See* Comm'r Mem. at 7 & n.6; R. 410-12.)

**IV.    The December 3, 2018 Administrative Hearing**

Plaintiff appeared with counsel for an administrative hearing before ALJ Grippo on December 3, 2018. (R. 407-53.)

**A.    Plaintiff's Testimony**

Plaintiff testified that she had done custodial work for various employers up until November 30, 2016, when she was laid off from the Mark Morris Dance Group. (R. 414-20.) She could not remember whether she had been laid off "for any reason related to [her health] problems," but she testified that, at the time she was laid off, her neck and back were in pain. (R. 420-21.)

After discussing her physical impairments at some length (R. 421-32), Plaintiff testified that she suffered from an anxiety disorder, but no other diagnosed mental health impairments. (R. 433-34.) She testified that her anxiety causes her to have panic attacks, which may be triggered by large crowds or stressful situations. (R. 434-35.) At her counsel's prompting, she confirmed that, outside of her panic attacks, approximately once every other day she experiences episodes of shortness of breath, tightness in her chest, and the need to sit down. (R. 435-36.) She further testified that, as a result of her anxiety, she "can't focus at all." (R. 436; *see also* R. 442 ("I

can't concentrate. . . . I don't think I can do my tasks like I used to.").) She further testified that her symptoms had persisted despite her taking medication for them, although she noted that Dr. Soloway had recently changed her medication (to Escitalopram, *see* R. 915), and she indicated that it was too early for her to tell whether the new medication would be effective. (R. 436-37.)

Asked about her "day-to-day life," Plaintiff testified that she lived with her three children—ages thirteen, eleven and five—and her "kids' father." (R. 437-39.) She described increasing difficulty managing household chores such as cooking and cleaning. (R. 439-41.) When prompted by her counsel for "anything that you think has been affecting your ability to work, any symptoms or problems that, you know, have bothered you that I didn't ask you about that you think I might have missed," Plaintiff responded, "Mostly my mental because I can't concentrate. . . . So I don't think I can do my tasks like I used to." (R. 441-42.)

ALJ Grippo then asked Plaintiff questions about her recent work history. Plaintiff testified that, for six months of 2017, she babysat her four-year-old grandson and her neighbor's newborn and toddler for approximately four hours a day, two or three days a week, but eventually stopped because "[she] couldn't do it no more." (R. 442-46.) When prompted by the ALJ, she clarified that her work for Mark Morris Dance Group had been on a part-time basis: three eight-hour overnight shifts per week. (R. 446.)

### B.   <u>Vocational Expert Testimony</u>

Vocational Expert ("VE") Jacqueline Schabacker, MS, CRC, LPC, SW also testified at the hearing. (R. 447-52.) She testified that Plaintiff's past work as a housekeeper/cleaner fell into the "light physical demand range." (R. 447.) ALJ Grippo asked the VE to consider a hypothetical individual with Plaintiff's age, education, and vocational background who could only occasionally

climb, balance, stoop, kneel, crouch and crawl, and who was "limited to work that is simple." (R. 447.) The VE confirmed that such an individual could still perform the duties of Plaintiff's previous housekeeper/cleaner jobs. (R. 447.) When considering the same hypothetical individual with the additional limitation of not being able to pay attention for more than 30 minutes at a time, the VE stated that in "there would be no work if that were on an ongoing basis." (R. 448.)

The VE then responded to several questions from Plaintiff's counsel. When asked whether "an individual [being] off-task 25 percent of the day [] would preclude work," she confirmed that "[y]es[,] [i]f that were on an ongoing basis, there would be no work." (R. 449.) When asked whether "four absences a month on an ongoing basis would be work-preclusive," the VE confirmed that "[i]t would." (R. 451.)

**V.     ALJ Grippo's Decision And Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since November 30, 2016, the alleged onset date. (R. 20.) At step two, the ALJ determined that the following impairments were severe: "degenerative disc disease ('DDD'), with right C5-6 radiculopathy, peripheral vascular disorder, and affective disorder." (R. 20.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21.) The ALJ specifically considered Listings 1.02, 1.04, 2.07, 4.11 and 4.12. (R. 21.) The ALJ also considered whether the "'paragraph B' criteria" had been met. He found that Plaintiff has a mild limitation in (1) understanding, remembering or applying information; (2)

interacting with others; and (3) adapting or managing oneself; and a moderate limitation in concentrating, persisting or maintaining pace. (R. 21-22.)

The ALJ then assessed Plaintiff's RFC, determining that she was able "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb, balance, stoop, kneel, crouch, and crawl; she can occasionally handle and finger with the right, dominant hand; and, she is limited to work that is simple." (R. 23.) The ALJ noted that while he found that "[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms," he also found "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [] not entirely consistent with the medical evidence and other evidence in the record." (R. 23-24.) The ALJ also noted that he found less than persuasive the medical opinions of each of Dr. Cohen, Dr. Soloway and Ms. Fuchs. (*See* R. 23-27.)

Moving on to step four, the ALJ found that Plaintiff had no past relevant work, as her work in the prior fifteen years either had not lasted long enough for her to have learned it or had not been performed at substantial gainful activity levels. (R. 27.)

At step five, the ALJ considered Plaintiff's age, education and job skills, along with her RFC determination, and, based on testimony from the VE, concluded that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, including counter clerk, usher and sandwich board carrier. (R. 28.) Therefore, the ALJ found that Plaintiff was not disabled during the relevant period and denied her claim for benefits. (R. 29.)

Following the ALJ's decision, Plaintiff sought review from the Appeals Council, which denied her request on April 9, 2020. (R. 1-5.)

## LEGAL STANDARDS

### I.   Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.   **Determination Of Disability**

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the

claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R.

16

§§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 51-52.

III.   **Regulations Regarding Consideration Of Medical Opinions And Prior Findings For Applications Filed On Or After March 27, 2017**

Previously, the SSA followed the "treating physician rule," which required the agency to give controlling weight to a treating source's opinion so long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, the regulations relating to the evaluation of medical evidence were amended for disability claims filed after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01, at *5844 (Jan. 18, 2017). Because Plaintiff's claim was filed on May 23, 2017 (*see* R. 17), the new regulations, codified at 20 C.F.R. §§ 404.1520c and 416.920c, apply. *See Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 7 (W.D.N.Y. 2021).

Under the new regulations, the Commissioner no longer will "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, when evaluating the persuasiveness of medical opinions, the Commissioner

will consider the following five factors: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." *Id.* §§ 404.1520c(c), 416.920c(c). Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* §§ 404.1520c(b), 416.920c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). While the ALJ "may, but [is] not required to, explain how [he] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ "*will* explain how [he] considered the supportability and consistency factors for a medical

source's medical opinions or prior administrative medical findings." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2) (emphasis added).

## DISCUSSION

Plaintiff argues that this action should be remanded because the ALJ's RFC determination "does not completely and accurately describe Plaintiff's mental limitations as documented in the evidence generally and, more particularly, in the unanimous medical opinions of record." (Pl.'s Mem., ECF No. 15, at 7.) Plaintiff identifies two purported legal errors made by the ALJ. First, she argues that the ALJ erred in failing to "acknowledge[] []or discuss[]" the consistency among the Cohen, Soloway and Fuchs medical opinions in their "opposition to the ALJ's simplistic mental RFC finding." (Pl.'s Mem. at 11.) Second, she argues that the ALJ erred in failing to "make a finding, one way or the other, regarding the persuasiveness of [Dr. Junga's] opinion." (*Id.* (emphasis omitted).) Plaintiff then goes on to challenge "the reasons given by the ALJ to find [the Cohen, Soloway and Fuchs opinions] non-persuasive," which the Court construes as an argument that the ALJ's mental RFC was not supported by substantial evidence. (*See* Pl.'s Mem. at 11-15.) For her part, the Commissioner argues that the ALJ's ruling should be upheld because it is supported by substantial evidence.[4] (*See* Comm'r Mem. at 1, 12-21.)

For the reasons set forth below, the Court finds that the ALJ's decision is free of legal error and supported by substantial evidence.

---

[4] Plaintiff did not submit a substantive reply brief, opting instead to "stand[] upon h[er] main brief in this case [in lieu of] filing any further responses." (Pl.'s Not. of No Reply, ECF No. 24.)

I.      **The ALJ Did Not Err In Assessing The "Consistency" Of The Medical Opinion Evidence**

Plaintiff first contends that the ALJ committed legal error by failing to "note the consistency of the medical opinions that oppose his patently understated RFC finding." (Pl.'s Mem. at 11.) Plaintiff's argument appears to be that, because the ALJ did not explicitly discuss the purported consistency of the opinions of Dr. Cohen, Dr. Soloway and Ms. Fuchs *with each other*, remand is required. (*See id*. at 10-11.)

The Court declines to remand on this ground. As an initial matter, these opinions are in fact significantly *inconsistent* with one another in the areas where they substantively overlap.[5] Further, nothing in the regulations (or case law cited by Plaintiff) specifically requires that an ALJ discuss this sort of "internal" consistency, or holds that, where an ALJ finds that multiple medical opinions are inconsistent with other evidence in the record, such inconsistency is necessarily trumped by consistency *among* those medical opinions.[6]

Rather, the regulations simply require that an ALJ assess each medical opinion's consistency with the other evidence in the record (as well as each opinion's supportability by objective medical evidence in the record). *See* 20 C.F.R. § 404.1520c(b)(2), 416.920c(b)(2). And

---

[5] (*Compare, e.g.*, R. 682 (Dr. Cohen: Plaintiff shows (1) "no evidence of limitation in understanding, remembering, or applying simple directions and instructions"; (2) "mild limitations" in "interacting adequately with supervisors, co-workers, and the public"; and (3) "mild limitations" in "sustaining concentration and performing a task at a consistent pace") *with* R. 700-01 (Ms. Fuchs, co-signed by Dr. Soloway: Plaintiff is (1) "Mildly Limited" in "Understanding and carrying out very short and simple instructions"; (2) "Not Limited" in "Ability to Interact with Others"; and (3) "Markedly Limited" in "Ability to Concentrate, Persist, or Maintain Pace").)

[6] *Cf.* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your [RFC] . . . , the final responsibility for deciding these issues is reserved to the Commissioner."); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("As we have stated previously, an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians.").

the Court finds that the ALJ sufficiently explained his findings with respect to these obligatory factors. The ALJ explained that he did not find Dr. Cohen's opinion "particularly persuasive" because it was not "fully support[ed]" by his examination of Plaintiff and because his finding of a marked limitation in Plaintiff was "inconsistent" with other evidence in the record, including her lack of prior mental health treatment and her ability to babysit three children for several months of the period at issue. (*See* R. 26-27.) Similarly, the ALJ was explicit that he found Dr. Soloway's opinion unpersuasive because "it [wa]s not well supported and it [wa]s inconsistent with [Plaintiff's] treatment history and [Plaintiff's] physical examinations," including being "misleading" regarding his treatment of Plaintiff. (*Id*.) Finally, the ALJ explained that he found LMSW Fuchs's opinion unpersuasive because it was "not supported" by treatment notes and because it was "inconsistent" with other medical evidence in the record, including Plaintiff's examinations showing intact attention and concentration, minimal mental health treatment history and response to medications (as reported by Dr. Soloway in November 2018); and with other non-medical evidence, including her ability to babysit, plans to vacation in North Carolina and attempt to secure custody of her grandson. (R. 27.)

Accordingly, the Court finds that the ALJ discharged his regulatory obligation to "explain how [h]e considered the supportability and consistency factors." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). And the Court finds no basis to conclude that the ALJ committed legal error by finding those opinions' inconsistency with the overall record more salient than any "internal" consistency among them.

II.   **The ALJ's Failure To Discuss Dr. Junga's Opinion Constituted Harmless Error**

Plaintiff also argues that the ALJ erred in failing to "ma[k]e a finding, one way or the other, regarding the persuasiveness of [Dr. Junga's] opinion," asserting that this too, on its own, is sufficient basis for remand. (Pl.'s Mem. at 11.)

The Court agrees with Plaintiff that the ALJ's decision does not acknowledge, let alone assess, Dr. Junga's opinion, as the regulations require. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b).[7] However, even assuming *arguendo* that the ALJ failed to consider Dr. Junga's opinion at all, the Court finds the ALJ's error harmless, because there is no reasonable likelihood that the ALJ's consideration of Dr. Junga's opinion would have changed the administrative outcome. *Cf. Zabala v. Astrue*, 595 F.3d 402, 409-10 (2d Cir. 2010) (remand unnecessary when medical report overlooked by ALJ "was not significantly more favorable to" claimant, such that there was "no reasonable likelihood that [the ALJ's] consideration . . . would have changed" the administrative outcome); *Fiducia v. Comm'r of Soc. Sec.*, No. 16-CV-01317 (GTS), 2017 WL 4513405, at *4 (N.D.N.Y. Oct. 10, 2017) (collecting cases "recogniz[ing] that failure to consider or weigh an opinion may be considered harmless error where consideration of that opinion would not have changed the outcome").

Several factors weigh in favor of this conclusion. First, Dr. Junga's opinion was significantly *less* favorable to Plaintiff than the opinions that the ALJ did consider. For example, while Dr. Cohen and Ms. Fuchs each found Plaintiff markedly limited in one area, Dr. Junga found that

---

[7] While Dr. Junga's assessments of Plaintiff constitute "prior administrative medical findings," not a "medical opinion," as the regulations define those terms, *see* 20 C.F.R. §§ 404.1513(a)(2), (5); 416.913(a)(2), (5), the Court will generally refer to those assessments, collectively, as "Dr. Junga's opinion."

Plaintiff's limitations were only mild or moderate. (R. 459, 463-64, 682, 700.) Indeed, Dr. Junga ultimately concluded that Plaintiff was capable of light work and not disabled. (R. 466)

Second, the ALJ's decision to limit Plaintiff to "light work" and "work that is simple" *already* accounted for the limitations identified by Dr. Junga. (R. 23.) While Dr. Junga found that Plaintiff had some mild or moderate limitations, none of these concerned her abilities as they pertained to "simple" instructions or decisions.[8] (*Id.*) Moreover, "[a] finding of moderate limitations in mental functioning does not preclude the ability to perform unskilled work." *Syble L. v. Comm'r of Soc. Sec.*, No. 19-CV-00434 (WBC), 2021 WL 1175981, at *6 (W.D.N.Y. Mar. 29, 2021); *see also Whipple v. Astrue*, 479 F. App'x 367, 370 (2d Cir. 2012) (consultative examiners' findings that plaintiff's depression caused moderate limitations in social functioning ultimately supported ALJ's determination that plaintiff could perform work that involved simple tasks in a low-stress environment); *Morales v. Comm'r of Soc. Sec.*, No. 17-CV-00341 (FPG), 2019 WL 1109572, at *7 (W.D.N.Y. Mar. 11, 2019) (finding "no basis for [the] argument that 'moderate' limitations in the ability to maintain attention and concentration translate into being 'off task' for some percentage during the workday" and upholding RFC limited to "simple, routine tasks").

---

[8] To the contrary, Dr. Junga found Plaintiff "not significantly limited" in her abilities to understand and carry out "very short and simple instructions"; "perform activities within a schedule, maintain regular attendance, and be punctual"; "sustain an ordinary routine without special supervision"; "work in coordination with [] others"; and "make simple work-related decisions." (R. 463-64.)

Thus finding no reasonable likelihood that the ALJ's consideration of Dr. Junga's opinion would have changed the administrative outcome, the Court deems the ALJ's failure to do so harmless error.[9]

**III.    <u>The ALJ's Decision Is Supported By Substantial Evidence</u>**

Finally, Plaintiff advances a series of arguments opposing the ALJ's stated rationales for finding the Cohen, Soloway and Fuchs opinions unpersuasive. (*See* Pl.'s Mem. at 11-15.) It is not clear from the briefing how Plaintiff understands these arguments to fit into the applicable legal standards. Absent legal error in an ALJ's decision, the only inquiry before a reviewing court is whether that decision was supported by substantial evidence. To the extent Plaintiff intends her arguments opposing the ALJ's reasoning as arguments that the ALJ's RFC was not supported by substantial evidence, the Court disagrees.

The ALJ discussed the medical and non-medical evidence in the record regarding Plaintiff's mental impairments and found that, while Plaintiff had some limitations in mental functioning, they were less extensive than alleged by Plaintiff, as her allegations were inconsistent with each other and her reported functioning. (R. 23-27.) Among other things, the ALJ identified as evidence supporting his findings Plaintiff's babysitting experience and acceptance of unemployment during the relevant period, lack of mental health treatment prior

---

[9] In conjunction with her argument regarding the ALJ's failure to consider Dr. Junga's opinion, Plaintiff also contends that the ALJ erred in failing "to adhere to the new regulations' requirement to *compare medical opinions to each other*." (Pl.'s Mem. at 11 (emphasis in original).) The new regulations do provide that, when an ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ will "articulate how he or she considered [factors 3-5] for those medical opinions." 20 C.F.R. §§ 404.1520c, 416.920c. However, the Court reads this provision as requiring such comparison only where, unlike here, the ALJ has concluded that the medical opinions at issue are "well-supported" and "consistent with the record."

to 2017, and evidence from Dr. Soloway that Plaintiff's anxiety had improved on medication.[10]

(*Id.*) And despite not finding the medical opinions entirely persuasive, the ALJ incorporated some

limitations in the Plaintiff's RFC by limiting her to simple work.

While Plaintiff may disagree with the ALJ's assessment of the opinion evidence and may

be able to point to evidence in the record that supports her position, "whether there is

substantial evidence supporting the [plaintiff's] view is not the question . . . [;] rather, [the Court]

must decide whether substantial evidence supports *the ALJ's decision*." *Bonet ex rel. T.B. v. Colvin*,

523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original); *see Johnson v. Astrue*, 563 F. Supp. 2d

444, 454 (S.D.N.Y. 2008) ("If the reviewing court finds substantial evidence to support the

Commissioner's final decision, that decision must be upheld, even if substantial evidence

supporting the claimant's position also exists."); *see also Brault v. Soc. Sec. Admin., Comm'r*, 683

F.3d 443, 448 (2d Cir. 2012) (reviewing court may reject an ALJ's factual findings "only if a

reasonable factfinder would *have to conclude otherwise*." (emphasis in original) (citation

---

[10] Plaintiff disputes the ALJ's reliance on several of these categories of evidence. For example, with regard to her prior babysitting activity, she argues that "transitory or sporadic activity does not disprove disability." (Pl.'s Mem. at 12-13.) However, Plaintiff's months-long babysitting engagement is hardly the type of sporadic or transitory activity contemplated by the case law she cites. (*See id.* (citing *Eldridge v. Colvin*, No. 15-CV-03929 (NSR) (PED), 2016 WL 11484451, at *15 (S.D.N.Y. June 29, 2016) (rejecting argument that plaintiff's having taken a "single domestic flight" disproved disability).). Nothing in *Eldridge* suggests that Plaintiff's maintenance of a steady babysitting engagement for at least six months (and likely longer, *see* R. 20) could not constitute evidence weighing in favor of her being employable. *See Zabala*, 595 F.3d at 407, 411 (affirming ALJ's rejection of medical opinion that plaintiff was "unable to be gainfully employed" as "'inappropriate' in view of [plaintiff's prior part-time] babysitting work"); *Hoyt v. Colvin*, No. 15-CV-00095 (VEC) (KNF), 2016 WL 3681425, at *3 (S.D.N.Y. Mar. 4, 2016) (describing babysitting as "a task requiring a significant degree of responsibility and the ability to cope with challenges").

Plaintiff also takes issue with the ALJ weighing against Plaintiff the fact that she had not previously "had much in the way of mental treatment." (Pl.'s Mem. at 14.) But Plaintiff's arguments focus on the ALJ's failure to discuss the treatment she received beginning in 2017 (Pl.'s Mem. at 14), which is unresponsive to the ALJ's point that Plaintiff's lack of any mental health treatment *prior to 2017* undermines the claim that she was suffering from marked limitations in her mental functioning as of 2017. (*See* R. 26-27.)

omitted)). Because Plaintiff has not shown that the ALJ's decision was unsupported by substantial evidence, I find no basis to remand based on the ALJ's RFC determination.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion is DENIED, and the Commissioner's cross-motion is GRANTED. The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

DATED:         New York, New York
               September 13, 2021

_____
STEWART D. AARON
United States Magistrate Judge